# 13-2187-BK

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

——— ▶▶◀◀ ———

IN RE: MOTORS LIQUIDATION COMPANY, *et al.*,

*Debtor.*

OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OF MOTORS LIQUIDATION COMPANY,

*Plaintiff-Appellant,*

*v.*

JPMORGAN CHASE BANK, N.A., INDIVIDUALLY AND AS ADMINISTRATIVE AGENT
FOR VARIOUS LENDERS PARTY TO THE TERM LOAN AGREEMENT DESCRIBED HEREIN,

*Defendant-Appellee.*

———————

*On Appeal from the United States Bankruptcy Court
for the Southern District of New York (New York City)*

## BRIEF FOR DEFENDANT-APPELLEE

John M. Callagy
Nicholas J. Panarella
Martin A. Krolewski
KELLEY DRYE & WARREN LLP
*Attorneys for Defendant-Appellee*
101 Park Avenue
New York, New York 10178
(212) 808-7800

## <u>CORPORATE DISCLOSURE STATEMENT</u>

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Appellee JPMorgan Chase Bank, N.A., a private non-governmental party, by its attorneys Kelley Drye & Warren LLP, certifies that the following reflects any publicly held corporate parents, and listing of any publicly held company that owns 10% or more of the party's stock:

JPMorgan Chase & Co.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................v

PRELIMINARY STATEMENT ............................................................1

COUNTER-STATEMENT OF ISSUES PRESENTED .........................4

COUNTER-STATEMENT OF THE CASE ..........................................5

COUNTER-STATEMENT OF FACTS ................................................7

    A.    The Synthetic Lease Transaction .........................................7

    B.    The Term Loan ....................................................................8

    C.    The Termination Of The Synthetic Lease Transaction In October 2008 .......................................................................9

        1.    The Synthetic Lease Termination Agreement Only Authorized The Termination Of Financing Statements Pertaining To The Synthetic Lease Transaction .....................10

        2.    Mayer Brown Believed That Everything On The Synthetic Lease Closing Checklist Related To The Repayment Of The Synthetic Lease Transaction ...................12

        3.    The Unrelated UCC-3 Referenced A Filing Number But Did Not Indicate That Such Number Related To The Term Loan ...............................................................................15

        4.    The Synthetic Lease Escrow Letter ........................................17

    D.    GM And Mayer Brown Did Not Believe They Had Any Authority To File A Termination Statement Related To The Term Loan .......................................................................19

    E.    GM Continued To Treat JPMorgan And The Other Term Loan Lenders As Fully Perfected, Secured Parties Under The Term Loan After October 30, 2008 ............................................22

SUMMARY OF ARGUMENT .............................................................23

ARGUMENT ..................................................................................26

I.     STANDARD OF REVIEW ....................................................26

II.    THE BANKRUPTCY COURT CORRECTLY HELD
       THAT THE FILING OF A UCC-3 TERMINATION
       STATEMENT IS NOT EFFECTIVE UNLESS IT
       HAS BEEN AUTHORIZED BY THE SECURED PARTY ......................27

III.   THE BANKRUPTCY COURT CORRECTLY HELD
       THAT JPMORGAN DID NOT AUTHORIZE
       THE FILING OF THE UNRELATED UCC-3 ............................................35

       A.    The Filing Of The Unrelated UCC-3 Was Not Effective
             Because GM And Mayer Brown Did Not Believe
             That JPMorgan Authorized Them To File It ......................................36

       B.    The Bankruptcy Court Correctly Held That The Synthetic
             Lease Termination Agreement Was The Only Grant Of
             Authority By JPMorgan To Terminate Financing Statements .........38

       C.    The Bankruptcy Court Correctly Considered JPMorgan's
             Intentions And Other Factors In Determining That JPMorgan
             Did Not Authorize The Filing Of The Unrelated UCC-3 .................41

       D.    The Bankruptcy Court Correctly Held That The Evidence
             Relied Upon By The Committee Did Not Establish Authority ........46

             1.    Reference On The Draft Synthetic Lease Closing
                   Checklist To A Filing Number Did Not Establish
                   Authority ...............................................................................46

             2.    Circulation Of A Draft Of The Unrelated
                   UCC-3 Did Not Establish Authority......................................48

             3.    The Bankruptcy Court Correctly Held
                   That The Synthetic Lease Escrow Letter
                   Did Not Convey Authority To Terminate
                   A Security Interest In The Term Loan ....................................51

             4.    The Bankruptcy Court Did Not Overlook
                   Testimony From Ryan Green Of Mayer Brown .....................54

5.    The Bankruptcy Court Did Not
      Misconstrue The Affidavit Of Robert Gordon ........................55

6.    The Affidavit From GM's Debra Hoge Is Relevant ...............56

IV.   THE UCC IS A "NOTICE FILING" SYSTEM ..........................................57

V.    JPMORGAN AND THE TERM LOAN LENDERS WERE
      SECURED CREDITORS AS OF THE PETITION DATE
      PURSUANT TO OTHER UCC-1 FINANCING STATEMENTS.............60

CONCLUSION .....................................................................................................61

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*ACF 2006 Corp. v. Merritt*,
No. CIV-12-161, 2013 WL 466603 (W.D. Okla. Feb. 7, 2013) .......................59

*AEG Liquidation Trust v. Toobro N.Y. LLC*,
32 Misc.3d 1202(A), No. 650680/10, 2011 WL 2535035
(N.Y. Sup. Ct. Jun. 24, 2011) ...............................................................34

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)............................................................................26

*Bank of N.Y. v. Alderazi*,
28 Misc. 3d 376 (N.Y. Sup. Ct. 2010) .................................................50

*Bryan v. State-Wide Ins. Co.*,
144 A.D.2d 325 (2d Dep't 1988)...........................................................49

*Clean Burn Fuels, LLC v. Purdue BioEnergy, LLC*
*(In re Clean Burn Fuels, LLC)*,
492 B.R. 445 (Bankr. M.D.N.C. 2013).................................................59

*Crestar Bank v. Neal (In re Kitchin Equip. Co. of Va., Inc.)*,
960 F.2d 1242 (4th Cir. 1992) .............................................................33

*Dassen v. Boland*,
No. S09C-06-042, 2011 Del. Super. Lexis 137
(Del. Super. Ct. Mar. 23, 2011) .........................................................28

*Demarco v. Edens*,
390 F.2d 836 (2d Cir. 1968) ....................................................37, 45, 46

*Ellicott Machine Co. v. United States*,
No. 29907, 1908 WL 736 (Ct. Cl. Jan. 4, 1909)...................................50

*Gen. Info. Assocs. P'ship v. Comm'r*,
Nos. 18405-90, 20111-90, 1992 WL 238777
(U.S. Tax Ct. Sept. 29, 1992) .............................................................28

*Gilbert Frank Corp. v. Fed. Ins. Co.*,
  70 N.Y.2d 966 (1988) ........................................................................52

*Goger v. Merchants Bank of Atlanta (In re Feifer Indus., Inc.)*,
  155 B.R. 256 (Bankr. N.D. Ga. 1993) ..........................................31, 32

*Goldman, Sachs & Co. v. Esso V.I., Inc. (In re Duplan Corp.)*,
  212 F.3d 144 (2d Cir. 2000) .......................................................26, 55

*Golfo v. Kycia Assocs., Inc.*,
  45 A.D.3d 531 (2d Dep't 2007), *appeal denied*, 10 N.Y.3d 704 (2008) ...........52

*Graham v. Henderson*,
  89 F.3d 75 (2d Cir. 1996) .................................................................26

*Guidi v. Inter-Cont'l Hotels Corp.*,
  No. 95 Civ. 9006 (LAP), 2003 WL 1878237 (S.D.N.Y. Apr. 14, 2003) ...........49

*Halpert v. Manhattan Apartments*,
  580 F.3d 86 (2d Cir. 2009) ...............................................................36

*Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*,
  241 F. Supp. 2d 246 (S.D.N.Y. 2002) .................................................36

*In re A.F. Evans Co., Inc.*,
  No. 09-41727 (EDJ), 2009 WL 2821510 (Bankr. N.D. Cal. Jul. 14,
  2009), *aff'd sub nom. Official Comm. of Unsecured Creditors v. City
  Nat'l Bank*, No. C09-03817 (MMC), 2011 WL 1832963
  (N.D. Cal. May 13, 2011) .................................................................30

*In re Hampton*,
  No. 99-60376, 2001 WL 1860362 (Bankr. M.D. Ga. Jan. 2, 2001)..................33

*Lange v. Mut. Of Omaha Bank (In re Negus-Sons, Inc.)*,
  Nos. BK09-82518, A10-8064 (TJM), 2011 WL 2470478
  (Bankr. D. Neb. June 20, 2011), *aff'd*, 460 B.R. 754
  (B.A.P. 8th Cir. 2011), *aff'd*, 701 F.3d 534 (8th Cir. 2012)................34

*In re Silvernail Mirror & Glass Inc.*,
  142 B.R. 987, 988-90 (Bankr. M.D. Fla. 1992)...........................................33, 59

*In re Wells*,
  129 Misc. 2d 56, 60 (N.Y. Sur. Ct. 1985)...........................................49

*Instinet, Inc. v. Ariel (UK) Ltd.*,
  No. 08-CV-7141 (JFK), 2010 WL 779324 (S.D.N.Y. Mar. 5, 2010) ...............41

*Koehring Co. v. Nolden (In re Pac. Trencher & Equip., Inc.)*,
  735 F.2d 362 (9th Cir. 1984) ...............................................................33

*Md. Nat'l Bank v. Porter-Way Mfg. Co.*,
  300 A.2d 8 (Del. 1972) .......................................................................58

*Merex A.G. v. Fairchild Weston Sys., Inc.*,
  810 F. Supp. 1356 (S.D.N.Y. 1993), *aff'd*, 29 F.3d 821 (2d Cir. 1994),
  *cert. denied*, 513 U.S. 1084 (1995)......................................................38

*Morgan Stanley High Yield Secs., Inc. v. Seven Circle Gaming Corp.*,
  269 F. Supp. 2d 206 (S.D.N.Y. 2003) ..................................................41

*Navillus Tile, Inc. v. Turner Const. Co.*,
  2 A.D.3d 209 (1st Dep't 2003) ............................................................52

*Palmdale Hills Prop., LLC v. Lehman Commercial Paper, Inc.
  (In re Palmdale Hills Prop., LLC)*,
  457 B.R. 29 (B.A.P. 9th Cir. 2011) ...............................................44, 53

*Peck v. Peck*,
  232 A.D.2d 540 (2d Dep't 1996)..........................................................52

*Peltz v. SHB Commodities, Inc.*,
  115 F.3d 1082 (2d Cir. 1997) .......................................................37, 45

*Peoples Bank of Ky., Inc. v. U.S. Bank, N.A. (In re S.J. Cox Enters., Inc.)*,
  Nos. 07-50705, 08-5066, 2009 WL 939573
  (Bankr. E.D. Ky. Mar. 4, 2009) ..................................................34, 35

*Playboy Enters., Inc. v. Dumas*,
  960 F. Supp. 710 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1347 (2d Cir. 1998) .........37

*Realty Growth Investors v. Council of Unit Owners*,
  453 A.2d 450 (Del. 1982) ............................................................37, 52

*Rock Hill Nat'l Bank v. York Chem. Indus., Inc. (In re York Chem. Indus.)*,
  30 B.R. 583 (Bankr. D.S.C. 1983).......................................................33

*Roswell Capital Partners LLC v. Alt. Constr. Techs.*,
    No. 08 Civ. 10647 (DLC), 2010 WL 3452378 (S.D.N.Y. Sept. 1, 2010),
    *aff'd by summary order on other grounds*, 436 F. App'x 34
    (2d Cir. 2011) ................................................................... 33, 34, 59

*SEC v. Credit Bancorp, Ltd.*,
    386 F.3d 438 (2d Cir. 2004) .............................................................58

*State St. Bank & Trust Co. v. Salovaara*,
    326 F.3d 130 (2d Cir. 2003) .............................................................26

*Ward v. Bank of Granite & Hickory Printing Solutions, LLC*
    *(In re Hickory Printing Group., Inc.)*,
    479 B.R. 388 (Bankr. W.D.N.C. 2012) ..............................................35

## STATUTES

Article 9 of the Uniform Commercial Code ("UCC") .....................................passim

Del. Code Ann. tit. 6, §1-103 ...............................................................36

Del. Code Ann. tit. 6, §9-102(a)(80) .....................................................28

Del. Cod Ann. tit. 6, §9-102(39). ..........................................................58

Del. Code Ann. tit. 6, §9-301 ...............................................................28

Del. Code Ann. tit. 6, §9-307 ...............................................................28

Del. Code Ann. tit. 6, §9-404 ...............................................................28

Del. Code Ann. tit. 6, §9-502 ...............................................................29

Del. Code Ann. tit. 6, §9-502 cmt. 2 ..................................................58, 59

Del. Code Ann. tit. 6, §9-502 cmt. 3 ..................................................29, 34

Del. Code Ann. tit. 6, §9-509 ............................................ 28, 29, 34, 35, 43, 50

Del. Code Ann. tit. 6, §9-509 cmt. 3 .....................................................36

Del. Code Ann. tit. 6, §9-510 ............................................ 28, 29, 34, 35, 43, 50

Del. Code Ann. tit. 6, §9-513(d) ...........................................................34

## OTHER AUTHORITIES

Rule 3001 of the Federal Rules of Bankruptcy Procedure .....................................53

Restatement (Third) of Agency §1.01 cmt. d (2006).................................................44

Restatement (Third) of Agency §1.03 cmt. b (2006).................................................47

Restatement (Third) of Agency §1.03 cmt. e (2006).................................................47

Restatement (Third) of Agency §2.01 (2006)....................................................36, 43

Restatement (Third) of Agency §2.01 cmt. c (2006).................................................37

Restatement (Third) of Agency §2.02 cmt. c (2006).................................................39

Restatement (Third) of Agency §2.02 cmt. e (2006)............................................37, 42

Restatement (Third) of Agency §2.02 cmt. h (2006)...........................................42, 43

Restatement (Third) of Agency §2.02 illus. 11 (2006)..............................................42

Restatement (Third) of Agency §3.01 (2006)....................................................36, 43

Restatement (Third) of Agency §3.15(2) (2006)......................................................40

Restatement (Third) of Agency §3.15 cmt. b (2006).........................................40, 50

Fred H. Miller & William H. Henning, *The Danger of Dictum*,
    45 UCC Law Letter 1, 3 (Mar. 2011) ...........................................................34, 59

Harry C. Sigman, *The Filing System Under Revised Article 9*,
    73 Am. Bankr. L. J. 61, 78 n. 110 (1999)....................................................29, 59

*Hawkland Uniform Commercial Code Series* §9-510:2 [Rev] (2013).............29, 34

National Conference of Commissioners on Uniform State Laws, *Draft
    Amendments to Uniform Commercial Code Article 9*, §9-518 cmt. 2
    (July 2010) ...............................................................................................59

## PRELIMINARY STATEMENT

In October 2008, in the course of the repayment by General Motors Corporation ("GM") to JPMorgan Chase Bank, N.A. ("JPMorgan") and certain other lenders of the $150 million balance due on a synthetic lease loan ("Synthetic Lease Transaction"), GM's counsel filed multiple UCC-3 termination statements, one of which had nothing to do with the Synthetic Lease Transaction ("Unrelated UCC-3"). The Unrelated UCC-3 purported to terminate the perfection of a security interest in connection with an entirely separate $1.5 billion term loan facility ("Term Loan") among GM, JPMorgan as administrative agent, and a different syndicate of lenders ("Term Loan Lenders"). Neither JPMorgan nor any of the Term Loan Lenders authorized the filing of the Unrelated UCC-3, which was not discovered until after GM filed for bankruptcy. While the Term Loan Lenders were paid the balance due on the Term Loan from the GM estate, the Official Committee of Unsecured Creditors ("Committee") was granted permission to bring an adversary proceeding claiming that the filing of the Unrelated UCC-3 eliminated the Term Loan Lenders' status as perfected secured creditors, and that the amounts repaid to the Term Loan Lenders should be clawed back.

In a thorough 74 page opinion, the Bankruptcy Court dismissed the Committee's claims, correctly holding that the Unrelated UCC-3 was not effective

because JPMorgan did not authorize its filing. The Committee now seeks reversal of the Bankruptcy Court's decision.

The Bankruptcy Court rejected the Committee's primary argument that even "mistaken" UCC-3 filings are nonetheless legally effective to eliminate a lien. The Bankruptcy Court held that the filing by GM's counsel of the Unrelated UCC-3 was not effective because it was not "authorized" by JPMorgan. The Bankruptcy Court relied on Article 9 of the Uniform Commercial Code ("UCC") and pertinent revisions in 2001, which eliminated the requirement that secured parties actually sign a UCC-3 and explicitly reaffirmed that such filings must be "authorized" to be effective. The Bankruptcy Court determined that GM and its counsel unequivocally testified they did not have, nor believed that they had, any authority to file termination statements relating to the Term Loan. The Bankruptcy Court also found that an October 2008 agreement between GM and JPMorgan specifically limited any such authority to the filing of termination statements relating to the Synthetic Lease Transaction. As the Bankruptcy Court held, that agreement was the only source of authority from JPMorgan to GM with respect to the filing of any termination statements, and it only authorized GM to file UCC-3s relating to real estate properties that served as collateral for the Synthetic Lease Transaction.

2

Unable to challenge the factual record, the Committee spins new theories. It argues for the first time that the relevant inquiry here stops with answering the question of whether JPMorgan authorized the physical "act" of filing the Unrelated UCC-3, thus manufacturing a distinction between the act and the consequences of the act. It contends that whether JPMorgan authorized the legal consequences of the physical "act" is irrelevant. To the Committee, it is enough that JPMorgan authorized the act. JPMorgan did neither.

The Committee bases this argument solely on the fact that documents prepared by GM's counsel and exchanged in the process of the Synthetic Lease Transaction repayment referenced the "filing number" of a UCC-1 financing statement pertaining to the Term Loan. But the factual record, including the sworn testimony of all the lawyers involved in the repayment of the Synthetic Lease Transaction (including GM's lawyers), reflects that not a single person was aware that this "filing number" was actually a reference to the Term Loan. Each such person testified that they believed that everything they prepared and filed related only to the repayment of the Synthetic Lease Transaction.

Aside from ignoring the sworn testimony and documentary evidence, the Committee's argument has no basis in law. Under agency law, the agent – GM – is only authorized to perform an act that the agent believes to be consistent with the intent of the principal – JPMorgan. Not a single person involved in the

3

Synthetic Lease repayment believed that JPMorgan had any intent to release any lien in connection with the Term Loan.

In a last ditch effort, the Committee also claims that the Bankruptcy Court's 74 page opinion overlooked testimony from GM's counsel helpful to the Committee's position. But the Committee simply tries to insinuate a factual dispute where none exists. The testimony to which the Committee refers does not, on its face, support the contention advanced, and therefore, does not demonstrate that the Bankruptcy Court committed any error.

In the end, the Committee asks this Court to find that the filing of the Unrelated UCC-3 was authorized even though the principal (JPMorgan), the principal's attorneys, the agent (GM) and the agent's attorneys did not believe any such authority existed, and a written agreement barred the agent from filing it. This Court should reject the Committee's attempt to turn agency law on its head. Accordingly, the Bankruptcy Court's decision should be affirmed.

## <u>COUNTER-STATEMENT OF ISSUES PRESENTED</u>

1.      Did the Bankruptcy Court correctly hold that under Article 9 of the UCC the filing of a termination statement is not effective unless it has been authorized by a secured party of record?

2.      Was the Bankruptcy Court correct in holding that the filing by GM's counsel of the Unrelated UCC-3 was ineffective because JPMorgan, as the

secured party of record, did not authorize that filing, and GM and its counsel did

not believe they had authority to file it?

## COUNTER-STATEMENT OF THE CASE

On June 1, 2009 ("Petition Date"), GM and certain subsidiaries

("Debtors") sought bankruptcy protection.  (Joint Appendix ("A") 982, ¶A.)  On or

about June 15, 2009, JPMorgan discovered, and promptly informed the

Committee, that GM's counsel had erroneously caused the filing of the Unrelated

UCC-3 in October 2008 in connection with the repayment of a separate Synthetic

Lease Transaction.  (Special Appendix ("SPA") 23; A2818-53; A3013.)  This was

the first time the Committee or its members became aware of the filing of the

Unrelated UCC-3.  (A3122-25.)  On June 25, 2009, the Bankruptcy Court entered

an order ("DIP Order") pursuant to which the Debtors repaid the Term Loan.

(SPA23; A974-1003.)  The DIP Order also released JPMorgan, as administrative

agent, and all the Term Loan Lenders from all claims, subject only to the

Committee's ability to investigate and bring an action with respect "only" to the

perfection of the security interests held by JPMorgan and other secured parties.

(A998.)

On July 31, 2009, the Committee commenced an adversary

proceeding seeking to recover the proceeds of the Term Loan that had been paid to

JPMorgan and the Term Loan Lenders during the bankruptcy.  (A82-145.)  Based

solely on the filing of the Unrelated UCC-3, the Committee asserted that the

financing statement perfecting the security interest in the Term Loan was

terminated in October 2008, thereby rendering the Term Loan unsecured as of the

Petition Date. (SPA3; A132.) By stipulation of the parties, the Committee

deferred service of its complaint on the Term Loan Lenders pending resolution of

the issues addressed in the Bankruptcy Court's decision, and now of this appeal.

(SPA3, n.2.)

       In July 2010, following extensive discovery, JPMorgan moved for

summary judgment. JPMorgan asserted that under the UCC as revised in 2001, the

filing of the Unrelated UCC-3 was not effective because such filing had not been

authorized. Simultaneously, the Committee moved for partial summary judgment

because, as the Bankruptcy Court noted, other financing statements in favor of

JPMorgan and the Term Loan Lenders covering specific collateral that also served

as security for the Term Loan remained in place as of the Petition Date. (SPA5,

n.7.) Both the Committee and JPMorgan agreed that the facts were not in dispute

on the issue of whether the filing of the Unrelated UCC-3 was authorized. (A285-

294.) On March 1, 2013, the Bankruptcy Court granted JPMorgan's motion for

summary judgment, denied the Committee's motion for partial summary judgment,

and entered judgment dismissing the Committee's complaint. (SPA3-8, 80-81.)

The Bankruptcy Court, *sua sponte*, certified its judgment for direct appeal to this Court. (SPA74-76.) By Order dated June 5, 2013, this Court authorized such direct appeal. (A3780.) This appeal followed.

## COUNTER-STATEMENT OF FACTS

### A.    The Synthetic Lease Transaction

On October 31, 2001, pursuant to a Participation Agreement, GM entered into a synthetic lease financing arrangement among multiple parties, including JPMorgan – the Synthetic Lease Transaction. (SPA8; A1041, ¶¶4-5; A1051-1795.) The Synthetic Lease Transaction provided GM with up to $300 million in financing from a syndicate of financial institutions for the acquisition of several parcels of real estate. (*Id.*) JPMorgan served as the administrative agent in the transaction. (SPA9; A1041, ¶4.)

GM's obligation to repay the Synthetic Lease Transaction was secured by liens on twelve real properties in the United States specifically defined in the Synthetic Lease Transaction documents as the "Properties". (SPA9; A1042, ¶6; A1401-1771; A1792-94.) To perfect the security interests in the Properties, UCC-1 financing statements were filed as fixture filings in counties in which such Properties were located, and UCC-1 financing statements had been filed with the Delaware Secretary of State. (SPA9; A1042, ¶7; A1797-1826.)

Simpson Thatcher & Bartlett LLP ("Simpson") represented JPMorgan in the Synthetic Lease Transaction. (SPA9; A1042, ¶8; A2681 at 9, 11; A2700 at 17.) Mayer Brown LLP ("Mayer Brown") represented GM. (SPA9; A2619 at 6-7; A2819, ¶2; A3127, ¶4.)

## B.  The Term Loan

On November 29, 2006, five years after the Synthetic Lease Transaction, GM and its subsidiary Saturn Corporation ("Saturn") entered into a seven year, senior-secured term loan facility – the Term Loan – with a syndicate of financial institutions as lenders – the Term Loan Lenders – and JPMorgan, again acting as administrative agent. (SPA9; A1043, ¶¶9-10; A1828-1935.) The Term Loan provided GM with approximately $1.5 billion in financing and was a completely separate transaction from the Synthetic Lease Transaction. (*Id.*)

At all pertinent times, either Cravath, Swaine & Moore LLP or Morgan, Lewis & Bockius LLP represented JPMorgan in connection with the Term Loan. (SPA9; A1044, ¶14; A2698, at 11; A2702-3 at 28-29.) Simpson never represented JPMorgan in connection with the Term Loan, and had no involvement in the Term Loan. (A1044, ¶14; A1046, ¶21; A2692, at 54-55.) Weil, Gotshal & Manges LLP, not Mayer Brown, represented GM on the Term Loan. (A1878.)

8

Pursuant to a collateral agreement ("Collateral Agreement"), the Term Loan Lenders obtained security interests in all of GM's equipment and fixtures at forty-two GM and Saturn plants and facilities ("Term Loan Collateral"). (SPA10; A1043-44, ¶¶11-12; A1942-44; A1958.) Thereafter, JPMorgan caused the filing of the following UCC-1 financing statements that perfected the Term Loan Lenders' security interests in the Term Loan Collateral: (a) two UCC-1s with the Delaware Secretary of State (one concerning GM and one for Saturn) (SPA10; A1044, ¶13; A1985-96); and (B) twenty-six state fixture filings in the counties where the GM had plants that housed Term Loan Collateral. (SPA10; A1044, ¶13; A1897-98; A1998-2146.)

The Term Loan Lenders' perfected security interests in the Term Loan Collateral could not be terminated unless GM fully repaid the loan or the Term Loan Lenders gave express written consent. (SPA46; A1876-77, §10.01; A1953, §7.13.) GM and Saturn also covenanted to maintain the perfection of the security interests in the Term Loan Collateral. (A1945, §4.03.) Such covenant could only be waived or modified in writing signed by all parties to the Collateral Agreement. (A1950, §7.01.)

## C.   **The Termination Of The Synthetic Lease Transaction In October 2008**

On September 30, 2008, GM informed its counsel on the Synthetic Lease Transaction, Mayer Brown, that it planned to repay the balance due under

that transaction – approximately $150 million at the time. (SPA10; A1045, ¶15; A2856.) GM specifically asked Mayer Brown to "prepare the documents necessary for [JPMorgan and the other lenders] to be paid off for the obligations on that synthetic lease and to release their interest in those properties." (SPA10; A2661 at 6.) Robert Gordon, a partner at Mayer Brown, assigned this work to Ryan Green, a Mayer Brown real estate associate. (SPA10-11; A2662 at 12.) He asked Mr. Green to draft documents necessary for "the termination and payoff of the synthetic lease." (*Id.*)

Mr. Green understood that his assignment, and all the documents he drafted in connection with it, related solely to the repayment of the Synthetic Lease Transaction. (SPA14; A2642 at 99.) Among the pertinent documents prepared by Mr. Green were: (i) a termination agreement; (ii) a closing checklist; (iii) UCC-3 termination statements; and (iv) an escrow letter, a discussion of each of which follows. (SPA11; A2151-62; A2859-66; A2886-90; A3031-3111.)

1.    **The Synthetic Lease Termination Agreement Only Authorized The Termination Of Financing Statements Pertaining To The Synthetic Lease Transaction**

A principal document drafted by Mayer Brown on GM's behalf in connection with the repayment of the Synthetic Lease Transaction was the "Termination Agreement and Release of Operative Agreements" ("Synthetic Lease Termination Agreement"). (A2151-62.) Mr. Green initially circulated a draft of

this agreement on October 15, 2008 to his client, GM, and to Simpson, JPMorgan's

counsel on the Synthetic Lease Transaction. (A2885-90.) GM, JPMorgan and the

other parties to the transaction executed it on October 30, 2008, the effective

closing date of the Synthetic Lease Transaction. (SPA14; A1045, ¶17; A2151-62;

A3128, ¶7.)

       The Synthetic Lease Termination Agreement explicitly restricted

GM's authority to file any UCC-3 termination statements corresponding to existing

UCC-1 financing statements that had been *filed in connection with the Properties*

that were the subject of the Synthetic Lease Transaction, nothing more. (A1045-

46, ¶18; A2641 at 95-96; A2665 at 22-23; A2692 at 56; A3128-29, ¶¶8-9, 11.)

Specifically, it stated:

> *[T]he Administrative Agent [i.e. JPMorgan] and Lessor
> do hereby* (x) release all of their Liens and Lessor Liens
> against the Properties created by the Operative
> Agreements, (y) acknowledge that such Liens and Lessor
> Liens are forever released, satisfied and discharged and
> *(x) authorize Lessee [i.e., GM] to file a termination of
> any existing Financing Statements relating to the
> Properties.*

(SPA12; A2151 (emphasis added).)

       As referenced above, the relevant Synthetic Lease Transaction

documents defined "Properties" to be twelve specified parcels of real estate.

(SPA12-13; A1335; A1792-94.) Accordingly, Mayer Brown, as the drafter of the

document, was well aware that GM's authority only extended to the Synthetic

Lease Transaction. (A2151-62; A2673 at 53-54; A2821.) As Mr. Gordon of

Mayer Brown testified and the Bankruptcy Court held, the Synthetic Lease

Termination Agreement was the "only document embodying a grant of authority"

by JPMorgan to terminate any UCC-1s. (SPA44; A2673 at 53-54.)

2.    **Mayer Brown Believed That Everything On The Synthetic
       Lease Closing Checklist Related To The Repayment Of The
       Synthetic Lease Transaction**

Mr. Green (the Mayer Brown associate), along with a Mayer Brown

real estate paralegal, Stewart Gonshorek, also drafted and circulated a closing

checklist ("Synthetic Lease Closing Checklist"). (A2620 at 11-12; A2878-83.)

The drafts of the Synthetic Lease Closing Checklist referenced documents Mr.

Green believed to be necessary to effectuate the repayment of the Synthetic Lease

Transaction (A2619 at 7-8; A2639 at 85-86), as evidenced by the title of Mr.

Green's checklist:

CLOSING CHECKLIST
General Motors: Release of Properties from JPMorgan Chase Synthetic Lease
CLOSING DATE: October 31, 2008.

(SPA14; A2878-83.)

Mr. Green determined what documents to include on the checklist by

"look[ing] through a copy of the [P]articipation [A]greement [for the Synthetic

Lease Transaction] . . . [which] contained a description of how to unwind and the

relevant documents." (A2619 at 8.) As the Bankruptcy Court held, and the

Committee concedes, "Green's intent – and only intent – was to list the documents [on the checklist] that would release Synthetic Lease facility collateral." (SPA14; Appellant Br. 19 (Mayer Brown "believed" that documents on the checklist "related to the 2001 synthetic lease financing").)

Accordingly, the Synthetic Lease Closing Checklist listed several dozen closing documents relating to the Properties, including UCC-1 financing statements that needed to be terminated. (SPA15; A2879-83.) Section 5 of the checklist, entitled "General Documentation," referenced filing numbers for three Delaware UCC-1 financing statements that Mr. Green believed needed to be terminated:

Termination of UCCs (central, DE filings) Blanket-type
financing statements as to real Property and related
collateral located in Marion County, Indiana (file number
2092532 5, file date 4/12/02 and file number 2092526 7,
file date 4/12/02)) financing statement as to equipment,
fixtures and related collateral located at certain U.S.
manufacturing facilities (file number 6416808 4, file date
11/30/06).

(SPA15; A2882.)[1]

Without dispute, everyone at Mayer Brown, GM's counsel on the
Synthetic Lease Transaction, believed that all of the Delaware UCC-1 financing
statements referenced in the checklist pertained only to the Synthetic Lease
Transaction. (A2642 at 99; A2657 at 47-48.) That proved to be incorrect. Two of
the three UCC-1 financing statements referenced therein did relate to the Synthetic
Lease Transaction. (SPA15.) Also referenced, however, and giving rise to this
litigation and appeal, was a UCC-1 financing statement filed against GM in favor
of JPMorgan with the filing number "6416808 4". (*Id.*) That UCC-1 also had

---

[1]   The three UCC-1 file numbers were derived from a UCC search that another
Mayer Brown paralegal, Michael Perlowski, performed in order to identify
UCC-1 financing statements filed against GM and in favor of JPMorgan in
Delaware. (SPA15; A2608 at 10-12; A2620 at 9; A2623 at 21-22; A2719.)
Working from the results of a prior Mayer Brown search for UCC-1
financing statements recorded against GM, Mr. Perlowski identified several
UCC-1 financing statements in response to Mr. Green's request. (SPA15;
A2608 at 12; A2721-2816.) Mr. Perlowski, however, was unaware of the
specific transaction on which Mr. Green was working, and so erroneously
included all of the financing statements in favor of JPMorgan that he found –
including one for the Term Loan. (SPA15; A2615-16 at 40-41.)

14

been filed in Delaware, but in connection with the Term Loan.  (SPA15; A1985-89.)

Mr. Green circulated several drafts of the Synthetic Lease Closing Checklist to GM and Simpson on October 15 and 21, 2008.  (SPA16; A2859-2988; A3020-3118.)  The subject lines of all of Mr. Green's cover e-mails attaching the drafts referenced "GM/JPMorgan Chase - Synthetic Lease".  (*Id*.)  None of his cover e-mails and drafts ever referenced the Term Loan.  (*Id*.)  Moreover, no recipient of a draft of the checklist recognized that the filing number "6416808 4" listed therein was unrelated to the Synthetic Lease Transaction and there were no discussions about that reference whatsoever.  (SPA16; A1045, ¶16; A1048-49, ¶29; A2639 at 88; A2642 at 99; A2683 at 18; A2684 at 22.)   In sum, as the Bankruptcy Court concluded:  "everyone believed they were working on the Synthetic Lease Transaction."  (SPA16.)

### 3. The Unrelated UCC-3 Referenced A Filing Number But Did Not Indicate That Such Number Related To The Term Loan

On October 15, 2008, Mr. Green also circulated nearly one hundred pages of draft documents referenced on the Synthetic Lease Closing Checklist, including ten different draft UCC-3 termination statements.  (SPA18; A2885; A2905-07; A2922-23; A2927-28; A2943-45.)  Mr. Green did not circulate copies of any of the UCC-1 financing statements that corresponded to the filing numbers

15

referenced on the ten draft UCC-3 termination statements.  (*Id.*)  The subject line

of Mr. Green's cover e-mail enclosing the draft documents – "GM/JPMorgan

Chase - Synthetic Lease (Auto Facilities Real Estate Trust 2001-1)" – reflected his

contemporaneous belief that all of his enclosures related to the repayment of the

Synthetic Lease Transaction.  (SPA18; A2885.)  Nothing in Mr. Green's cover e-

mail or enclosures referenced the Term Loan.  (SPA18; A2885-2973.)

        One of the draft UCC-3 termination statements circulated by Mr.

Green – the Unrelated UCC-3 – corresponded to a UCC-1 financing statement

numbered 6416808 4, which, as discussed above, actually related to the Term

Loan.  (A2907.)  Contrary to the Committee's misplaced suggestion (Appellant Br.

21), other than the numerical designation, the Unrelated UCC-3 made no reference

whatsoever to the Term Loan.  (SPA17; A2907.)  It also – as per the 2001

amendments to the UCC – had no place for JPMorgan's signature, did not require

such a signature and was never signed by JPMorgan.  (SPA22; A1046, ¶19.)

        Mr. Gonshorek, who prepared the Unrelated UCC-3, intended "to

terminate the UCC in connection with the synthetic lease becoming unwound" –

testimony that, like most testimony in this case, the Committee ignores.  (SPA17;

A2650 at 20.)  Indeed, under item 10 of the Unrelated UCC-3, Mr. Gonshorek

typed in "Matter No. 00652500" – an internal Mayer Brown client-matter number

16

relating exclusively to Mayer Brown's representation of GM in connection with the Synthetic Lease Transaction. (SPA17; A2638 at 81-82; A2907.)

**4.      The Synthetic Lease Escrow Letter**

To facilitate the repayment of the Synthetic Lease Transaction, GM and JPMorgan used an escrow agent to hold the closing documents in escrow pending receipt of the loan repayment proceeds from GM. (SPA18; A2664 at 19; A2687 at 33-34; A3005-11.) Thus, on behalf of GM, Mayer Brown also drafted an escrow letter ("Synthetic Lease Escrow Letter") that provided the escrow agent with instructions to effectuate the closing. (SPA19, n.37; A2990-3003.) On October 24, 2008, Mr. Green circulated a draft of that letter to JPMorgan's counsel and others. (*Id.*) The subject line of Mr. Green's cover e-mail once again explicitly referred to the Synthetic Lease Transaction: "RE: GM/JPMorgan Chase – Synthetic Lease (Auto Facilities Real Estate Trust-200-1)." (*Id.*) As Mr. Gordon of Mayer Brown testified, the purpose of the letter was "[t]o arrange for the payoff of the GM synthetic lease." (SPA19; A2664 at 19.) Indeed, the first page of the Synthetic Lease Escrow Letter in its subject line stated:

> Termination of that certain Participation Agreement dates
> as of October 31, 2001, among General Motors
> Corporation ("**GM**"), as Lessee and Construction Agent,
> Auto Facilities Real Estate Trust 2001-1 ("**Trust**") . . .
> and JPMorgan Chase Bank ("**Agent**"), as Administrative
> Agent, as amended (the "**Participation Agreement**")
> and release of all liens related thereto including liens
> relating to the following properties:  (i) the SPO

> Headquarters Building located in Grand Blanc, Michigan
> (the "**Grand Blanc Property**"); (ii) the GM Powertrain
> L6 Engine Plant in Flint, Michigan (the "**Flint
> Property**"); (iii) the Franklin Deck in Detroit, Michigan
> (the "**Franklin Deck**"); (iv) the River East Parking Deck
> in Detroit, Michigan (the "**River East Deck**"); and (v)
> Parcel 6/C in Detroit, Michigan ("**Parcel 6/C**") . . .

(A3005.)

The Synthetic Lease Escrow Letter then listed 47 sets of documents and stated that the parties would each receive such documents upon closing. (A3005-08.) Those documents were defined collectively as the "Escrow Documents." (A3005.) Among the Escrow Documents, entry number 2 referenced "Termination of UCC Financing Statements (File Numbers 2092532 5, 2092526 7, and 6416808 4) (the "General UCC-3 Terminations")". (*Id.*) There was no reference to the Term Loan other than the number, 6416808 4. (*Id.*)

The Synthetic Lease Escrow Letter instructed the escrow agent, upon closing, to forward the General UCC-3 Terminations to Mayer Brown, GM's counsel on the Synthetic Lease Transaction. (SPA21; A3010.) As the Bankruptcy Court observed:

> while the Unrelated UCC-3 was listed as one of the
> documents to be *delivered* to the Title Company, it was
> not listed as one of the documents to be *recorded*. Rather
> the [escrow agent] was instructed to deliver it (along with
> others) to GM's counsel, Mayer Brown.

18

(SPA21 (emphasis in original).)[2]  As GM's counsel testified:

> The [termination] statements that related to the
> GM/Chase synthetic lease were permitted to be filed by
> [virtue of] the [Synthetic Lease Termination Agreement],
> not [the Synthetic Lease Escrow Letter].

(A2665 at 21.)

GM repaid the amount due on the Synthetic Lease Transaction on October 30, 2008.  (SPA22; A1046, ¶19; A3120.)  Thereafter, GM's counsel caused the filing of UCC-3 termination statements with the Delaware Secretary of State on October 30, 2008, including the Unrelated UCC-3.  (SPA22; A3015-18.)

## D. GM And Mayer Brown Did Not Believe They Had Any Authority To File A Termination Statement Related To The Term Loan

All of the Mayer Brown attorneys and paralegals who worked on the repayment of the Synthetic Lease Transaction believed that everything they prepared and filed on GM's behalf in connection with the repayment related only to that transaction, nothing more.  (SPA22; A2639 at 88; A2642 at 99; A2657 at 46-47; A2663 at 13-14.)  They all testified that at no point did they believe they had any authority to file a UCC-3 termination statement related to the Term Loan. (SPA22; A2639-40 at 88-90; A2643 at 103; A2676 at 65-66; A2819-21.)  In fact,

---

[2]     The Synthetic Lease Escrow Letter did instruct the escrow agent to record a subset of the Escrow Documents (defined therein as "Recording Documents") following the repayment but those documents did not include any Delaware UCC-3 termination statements.  (A3009-10.)

they were not counsel to GM on the Term Loan. On appeal, the Committee ignores nearly all of this uncontroverted testimony.

For instance, in June 2009, after the discovery of the filing of the Unrelated UCC-3, Mr. Gordon attested that Mayer Brown never represented GM in connection with the Term Loan, and that GM was not authorized by the Synthetic Lease Termination Agreement "to terminate any financing statement relating to the Term Loan Agreement." (A2821, ¶10.) Mr. Gordon also *explicitly testified* at his deposition that Mayer Brown was not authorized to file the Unrelated UCC-3:

> Q. During the period of time that you were working on this transaction -- this synthetic lease transaction up to the present, has anybody ever told you that JPMorgan authorized the filing of the unrelated termination statement?
>
> A. No.
>
> Q. During the period of time you worked on this matter up to today, did you ever form the belief that Mayer Brown was authorized in filing the unrelated termination statement?
>
> A. No.

(SPA22; A2676 at 66.)

Mr. Green also testified that he never became aware, in the context of his work on the Synthetic Lease Transaction, that a UCC-3 relating to the Term Loan had been filed. (A2639-40 at 88-90.) Indeed, prior to the GM bankruptcy

20

filing, Mr. Green had never even heard of the Term Loan. (A2638 at 84; A2640 at 89.) Mr. Green further testified that he never believed that Mayer Brown had been given any authority to release liens pertaining to the Term Loan. (SPA22; A2642 at 99.)

Likewise, Mr. Gonshorek testified that he believed that all of the paralegal work that he performed at Mr. Green's request in October of 2008 related to the repayment of the Synthetic Lease Transaction. (A2657 at 47-48.) Mr. Perlowski, the other Mayer Brown paralegal who worked on the matter, did not have any knowledge of the nature of the transaction for which he was asked to search for Delaware state filings. (A2615-16 at 40-41.)

Similarly, Debra Hoge, GM's current Director of the Worldwide Real Estate Group for North America, who executed the Synthetic Lease Termination Agreement, provided an affidavit in which she affirms that:

> Old GM was not authorized by the Synthetic Lease Termination Agreement, nor did old GM believe it had any authority, to terminate any UCC-1 financing statement related to the Term Loan. Nor did old GM provide Mayer Brown with any authority to file a termination statement with respect to a UCC-1 financing statement relating to the Term Loan.

(SPA22; A3129, ¶11.) Deponents from JPMorgan and its counsel also testified that they gave no authority to GM or Mayer Brown to file the Unrelated UCC-3. (A1046, ¶20; A2692 at 56.) Indeed, it is undisputed that GM, Mayer Brown,

JPMorgan and Simpson first learned about this unauthorized filing in June 2009, after the Petition Date. (A1048-49, ¶29; A2613 at 32; A2633 at 64; A2654 at 35; A2666 at 25; A2701 at 22; A3129, ¶12.)

**E.     GM Continued To Treat JPMorgan And The Other Term Loan Lenders As Fully Perfected, Secured Parties Under The Term Loan After October 30, 2008**

The actions of JPMorgan and GM after October 30, 2008, the date of the purported termination, further evidenced that all parties believed that JPMorgan continued to hold a perfected security interest in the Term Loan Collateral. (A1047, ¶¶22-23; A2164-65.) For example, after several months of negotiations, GM and the Term Loan Lenders agreed to amend the Term Loan on March 4, 2009 ("First Amendment"). (*Id.*) Among other things, the First Amendment increased fees to be paid to the Term Loan Lenders, increased the Term Loan Collateral ratio and required GM to provide a detailed Term Loan Collateral report on a quarterly basis. (A1047-48, ¶¶25-27; A2167-2461.) GM also reiterated that the lien over the Term Loan Collateral remained perfected – further evidencing its lack of belief that JPMorgan provided any authority to terminate the lien. (A1048, ¶28.)

GM also continued to provide collateral value certificates to JPMorgan after October 30, 2008, as required by the Term Loan and First Amendment, certifying that the net book value of the Term Loan Collateral to the outstanding obligation exceeded the contractual requirement. (A1048, ¶ 26;

A1863, §5.02(c); A2463-70.)  As reflected in a collateral value certificate dated May 28, 2009, only three days before the Petition Date, the Term Loan Collateral's book value exceeded $5.6 billion dollars – far more than the Term Loan.  (A1048, ¶27; A2468-70.)

## SUMMARY OF ARGUMENT

Under the plain language of Article 9 of the UCC, and as the Committee conceded to the Bankruptcy Court during oral argument, the filing of a UCC-3 termination statement is not effective unless it has been authorized by the secured party.  Nonetheless, the Committee still argues to this Court that the mere act of filing a termination statement makes it effective regardless of whether or not its filing was authorized.  That is not the law.  As the Bankruptcy Court recognized, the legal authority relied upon by the Committee is inapplicable.  In the Committee's cases, either authority for the filing was not at issue or the court failed to recognize that the UCC plainly requires filings to be authorized by the secured party.

As the Bankruptcy Court also properly recognized, under the law of agency, an agent does not act with authority if "the agent did not believe, or could not reasonably have believed" that the principal's grant of authority encompassed the matter in question.  Here, all GM and Mayer Brown witnesses gave sworn, uncontroverted testimony – ignored by the Committee on appeal – that they did not

believe that JPMorgan authorized them to file the Unrelated UCC-3. Such testimony of the agent's understanding, as the Bankruptcy Court found, is "conclusive". In addition, the Synthetic Lease Termination Agreement restricted GM's authority to file UCC- 3 termination statements only as to the Properties that served as collateral for the Synthetic Lease Transaction. It was, as the Bankruptcy Court properly concluded, the one and only grant of authority from JPMorgan to GM with respect to the filing of any termination statements.

Unable to argue against the undisputed evidence and sworn testimony, the Committee tries to change the focus. The Committee asserts that the relevant inquiry is not whether GM or Mayer Brown understood it had authority to file the Unrelated UCC-3, but whether JPMorgan authorized the physical "act" of filing the Unrelated UCC-3.[3] First, this is not the relevant inquiry under the long standing principles of law governing a determination of the scope of authority. Second, the Bankruptcy Court did indeed consider the facts advanced by the Committee as reflecting JPMorgan's purported manifestation of authority even as it related to the physical "act" of filing, including the subject matter of the parties' communications, the Term Loan transaction documents and the parties' awareness

---

[3]    The Committee pursued three theories before the Bankruptcy Court, to establish authority: (1) actual authority; (2) apparent authority; and (3) ratification. (SPA33, 55, 57.) On appeal, however, the Committee abandons its theories of apparent authority and ratification. (Appellant Br. 35.)

at the time of the Unrelated UCC-3 filing. All of this evidence supported the Bankruptcy Court's decision that the Unrelated UCC-3 was unauthorized.

The Bankruptcy Court also properly rejected the Committee's arguments that JPMorgan authorized the filing of the Unrelated UCC-3 based on references – on the Synthetic Lease Closing Checklist, the draft Unrelated UCC-3 and the Synthetic Lease Escrow Letter – to a filing number of a UCC-1 financing statement pertaining to the Term Loan. None of these documents were an authorization by JPMorgan to do anything. Nor did GM and Mayer Brown form a belief based on the exchange of these documents that they were authorized to file a termination statement relating to a Term Loan. All of these documents, and the communications about them, explicitly referenced the Synthetic Lease Transaction, and everyone believed that they all related exclusively to that transaction. The Committee's reliance on comments from Simpson to Mayer Brown about these documents is misplaced because: (i) Mayer Brown witnesses did not understand these comments to authorize them to file anything, let alone a termination statement relating to a Term Loan; and (ii) Simpson, as JPMorgan's counsel on the Synthetic Lease Transaction, could not, as a matter of law, bind JPMorgan with respect to the Term Loan – a matter on which it was not engaged by JPMorgan.

The Committee's argument that the Bankruptcy Court overlooked testimony from Mr. Green and Mr. Gordon is also specious. The testimony it cites

does not, on its face, support its conclusion that Mayer Brown believed JPMorgan authorized it to file the Unrelated UCC-3. Indeed, it is the Committee that overlooks uncontroverted testimony from Mr. Green and Mr. Gordon, who unequivocally testified that they did not believe that Mayer Brown was authorized to file the Unrelated UCC-3. The Committee also argues that the affidavit of GM's Ms. Hoge lacks foundation. But, as set forth in the affidavit, Ms. Hoge was the person at GM responsible for the Synthetic Lease Transaction and signed the Synthetic Lease Termination Agreement.

## ARGUMENT

## I.  STANDARD OF REVIEW

This Court reviews a bankruptcy court's conclusions of law *de novo* and findings of fact for clear error. *See Goldman, Sachs & Co. v. Esso V.I., Inc. (In re Duplan Corp.)*, 212 F.3d 144, 151 (2d Cir. 2000). Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law. *See State St. Bank & Trust Co. v. Salovaara*, 326 F.3d 130, 135-36 (2d Cir. 2003) (internal citations omitted). "[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law…" *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

II.  **THE BANKRUPTCY COURT CORRECTLY HELD THAT THE FILING OF A UCC-3 TERMINATION STATEMENT IS NOT EFFECTIVE UNLESS IT HAS BEEN AUTHORIZED BY THE SECURED PARTY**

The Committee continues to erroneously argue that the "effect of a [UCC-3] termination statement on a security interest is 'dramatic and final'". (Appellant Br. 50.)  Ignoring the Bankruptcy Court's finding that the Committee's case law was inapplicable, the Committee asserts that the mere filing of the Unrelated UCC-3, even if unauthorized, makes it "legally effective".  (*Id.*)  That is simply not the law.  As the Bankruptcy Court correctly concluded, "[u]nder the present Article 9, a UCC termination statement is not necessarily "dramatic and final" and the filing of a termination statement "is only the start . . .  not the end – of the judicial inquiry."  (SPA6.)  Instead:

> When an agent acts on behalf of a secured lender principal to terminate an initial financing statement with respect to a financing, to be effective the termination must be *authorized* by the secured lender principal;

(SPA7 (emphasis in original).)

27

Specifically, in 2001, amendments to Article 9 of Title 6 of the
Delaware Code[4] eliminated the requirement that the secured party sign a UCC-3
termination statement prior to its filing. *Compare* Del. Code Ann. tit. 6, §§9-509
and 9-510 *with former* §9-404 (West 2010). Pursuant to sections 9-509 and 9-510,
a filing of a UCC-3 termination statement could be effective without any signature
of a secured party *provided that the filing was authorized by the secured party*.
*See id.* §9-509(d)(1).

Section 9-510 of the Delaware Code provides in subsection (a)
entitled "Filed record effective if authorized" that "[a] filed record is effective only
to the extent that it was filed by a person that may file it under Section 9-509."
*Id.* §9-510(a). Section 9-509(d) provides in pertinent part:

> A person may file an amendment[5] other than an
> amendment that adds collateral covered by a financing

---

[4] The Bankruptcy Court correctly held, and both the Committee and
JPMorgan agree, that although the Delaware UCC applies (Del. Code Ann.
tit. 6, §§9-301, 9-307), consideration of decisions from other jurisdictions
applying comparable provisions is appropriate. (SPA25.) Moreover,
consideration of the Restatement and New York cases on the law of agency
is also appropriate (SPA26) because the law of agency does not differ
between Delaware and New York. *See Gen. Info. Assocs. P'ship v. Comm'r*,
Nos. 18405-90, 20111-90, 1992 WL 238777, at \*5 n. 4 (U.S. Tax Ct. Sept.
29, 1992); *Dassen v. Boland*, No. S09C-06-042, 2011 Del. Super. Lexis 137,
at \*16 (Del. Super. Ct. Mar. 23, 2011) ("Delaware courts have repeatedly
cited the Third Restatement [of Agency] with regard to agency principles.").

[5] A UCC-3 (the method for terminating a financing statement) is an
amendment. *See* Del. Code Ann. tit. 6, §9-102(a)(80).

statement or an amendment that adds a debtor to a
financing statement only if:

(1) *the secured party of record authorizes the filing*; . . . .

*Id.* §9-509(d)(1) (emphasis added).

The comments to section 9-502 also provide that "a filing has legal effect only to the extent that it is authorized." *See id.* §9-502 cmt. 3 (*citing* Del. Code Ann. tit. 6, §9-510). Leading UCC authorities agree. *See Hawkland Uniform Commercial Code Series* § 9-510:2 [Rev.] (2013) ("[t]he fate of a record filed by someone other than a person given the power to do so under revised Section 9-509 is quite clear. Such a filing is ineffective…The same is true for a termination statement not authorized by the secured party of record."); Harry C. Sigman, *The Filing System Under Revised Article 9*, 73 Am. Bankr. L. J. 61, 78 n. 110 (1999) (if an unauthorized person files a UCC-3, the corresponding UCC-1 financing statement will remain effective).

Contradicting its current position before this Court, during oral argument before the Bankruptcy Court, the Committee also agreed that unauthorized filings are not effective:

THE COURT: . . . but 9-510(A), it's pretty clear, isn't it?

MR. FISCHER [Committee's Counsel]: It is clear that an unauthorized filing is not effective. The question is of course, 9-509(d), was this an authorized filing?

(A3385.)

29

The Bankruptcy Court relied on *In re A.F. Evans Co., Inc.*, No. 09-41727 (EDJ), 2009 WL 2821510 (Bankr. N.D. Cal. Jul. 14, 2009), *aff'd sub nom. Official Comm. of Unsecured Creditors v. City Nat'l Bank*, No. C09-03817 (MMC), 2011 WL 1832963 (N.D. Cal. May 13, 2011).  (SPA50-51.)  There, a creditor filed a UCC-1 financing statement to perfect its security interest in all of the debtor's assets, including various partnership interests.  *Id.* at *1.  Thereafter, the debtor wished to sell two of its partnership interests but not the balance covered by the UCC-1.  *Id.*  To facilitate the sale, the creditor agreed to release its perfected security interest only as to those two partnership interests.  Although the creditor authorized an escrow agent to file an amendment to effect a limited release only of its security interest in just the two partnership interests, the escrow agent instead filed UCC-3 termination statements that purported to terminate the perfection of the creditor's security interests in all of the debtor's assets.  *Id.* at *2.  Later, relying on its security interest, the creditor sought proceeds from the court-approved sale of the debtor's assets.  The unsecured creditors' committee, however, argued that the filing of the UCC-3s terminated the creditor's secured status entirely.  *Id.*

Relying, in part, on an uncontroverted declaration from the creditor stating that the escrow agent failed to act within its scope of authority, the bankruptcy court held that the creditor did not authorize the termination of all of its

security interest and thus, "[i]t follows that [the creditor] was not bound by [the escrow agent's] unauthorized modification to the UCC-3[.]" *Id.* at *4.

The Committee attempts to distinguish *A.F. Evans* by arguing that the agent, and not the principal, made the "mistake". (Appellant Br. 56-57.) In fact, *A.F. Evans* supports the Bankruptcy Court's finding. First, the Committee focuses on the wrong question. In both *A.F. Evans* and here, the termination statement was ineffective because the secured party did not authorize its filing, not because of a determination as to who made the mistake. Second, the facts here are stronger than in *A.F. Evans*. Here, both the agent and its representative (GM and Mayer Brown) did not believe there was authority to file the Unrelated UCC-3. (*See supra* pp. 19-22.)

*Goger v. Merchants Bank of Atlanta (In re Feifer Indus., Inc.)*, 155 B.R. 256 (Bankr. N.D. Ga. 1993), a decision preceding the 2001 amendments to the UCC, is also instructive. There, two banks jointly filed a financing statement perfecting their security interest in a debtor's assets. *Id*. at 258. Thereafter, a UCC-3 termination statement, signed by an officer for only one of the banks, was filed, purporting to terminate the jointly filed financing statement. *Id*. Later, the debtor granted security interests in its assets to third parties. *Id*. After the debtor filed its bankruptcy petition, the trustee then in the shoes of the second bank sought a determination that its security interest had priority over the subsequent lien

31

holders because the termination statement filed by only one of the banks was unauthorized and ineffective as to the others. *Id*. at 258-59. The bankruptcy court agreed. *Id*. at 261-62.

As the Bankruptcy Court correctly held, the principal legal authorities relied upon by the Committee are inapplicable. (SPA62.) Relying on cases that pre-date the 2001 amendments to Article 9 of the UCC, the Committee initially argues that the 2001 amendments did not abrogate the rule that mistakenly filed termination statements are effective. (Appellant Br. 6, 49-50.) None of these decisions, however, address the central issue in this case of whether the secured party authorized the filing, by its agent, of a UCC-3 termination statement. Instead, they only hold, on different facts, that a UCC-3 termination statement signed and filed by the secured party itself, even if done by mistake, is nonetheless effective. (Appellant Br. 50-53.) Authority to file the contested UCC-3 was not

addressed because the UCC-3s at issue had to be signed and were signed by an employee of the secured party. (SPA62.)[6]

The Committee also cites to post-2001 cases, which the Bankruptcy Court also correctly declined to follow. (SPA63-73.) In particular, the Committee relies on a case out of this Circuit – *Roswell Capital Partners LLC v. Alt. Constr. Techs.*, No. 08 Civ. 10647 (DLC), 2010 WL 3452378 (S.D.N.Y. Sept. 1, 2010), *aff'd by summary order on other grounds*, 436 F. App'x 34 (2d Cir. 2011). In *Roswell*, a group of lenders obtained a security interest in debtor's property. Thereafter, these lenders converted their debt into equity in the debtor. *Id.* at *2. After the value of the equity interest deteriorated, these lenders subsequently returned their equity and reinstated the debt obligation. *Id.* at *4. In the meantime, however, the debtor had filed UCC-3s to terminate these lenders' security interests and a second group of lenders had filed financing statements on the debtor's property to secure their debt. *Id.* at *3-4. After the original lenders converted their equity back into a debt obligation, they sued to enforce the priority of their security interest in the debtor's property over the subsequent lenders. *Id.* at *2-3. The

---

[6]    *See, e.g.*, *Crestar Bank v. Neal (In re Kitchin Equip. Co. of Va., Inc.)*, 960 F.2d 1242, 1244-46 (4th Cir. 1992) (secured party signed and filed UCC-3); *Koehring Co. v. Nolden (In re Pac. Trencher & Equip., Inc.)*, 735 F.2d 362, 364-65 (9th Cir. 1984) (same); *In re Hampton*, No. 99-60376, 2001 WL 1860362, at *1 (Bankr. M.D. Ga. Jan. 2, 2001) (same); *In re Silvernail Mirror & Glass Inc.*, 142 B.R. 987, 988-90 (Bankr. M.D. Fla. 1992) (same); *Rock Hill Nat'l Bank v. York Chem. Indus., Inc. (In re York Chem. Indus.)*, 30 B.R. 583, 584-85 (Bankr. D.S.C. 1983) (secured party filed UCC-3).

Bankruptcy Court agreed with the *Roswell* court's decision (affirmed by this Court) that the original lenders' security interest was extinguished upon conversion of their debt to equity. (SPA67.)

The Bankruptcy Court, however, correctly declined to follow the *Roswell* court's additional rationale for its conclusion, stated in *dicta* and not adopted by this Court, that the termination statement filed by the debtor was effective even if not authorized by the lenders. (SPA67-68.) The Bankruptcy Court, along with multiple other courts and authorities,[7] correctly held that the *Roswell* court's additional rationale could not "be squared" with UCC §§9-509(d), 9-510, 9-513(d) and Official Comment 3 to UCC §9-502, all of which require authorization for a UCC-3 to be effective. (SPA69.)

Similarly, the Bankruptcy Court correctly concluded that the Committee's reliance on *Peoples Bank of Ky., Inc. v. U.S. Bank, N.A. (In re S.J. Cox Enters., Inc.),* Nos. 07-50705, 08-5066, 2009 WL 939573, at *4-6 (Bankr. E.D. Ky. Mar. 4, 2009) was misplaced. (SPA63-65.) Even though the bankruptcy

---

[7]    *See AEG Liquidation Trust v. Toobro N.Y. LLC*, 32 Misc.3d 1202(A), No. 650680/10, 2011 WL 2535035, at *9 n. 1 ( N.Y. Sup. Ct. Jun. 24, 2011) (criticizing *Roswell* because unauthorized termination statement could not terminate a secured party's security interest); *Lange v. Mut. Of Omaha Bank (In re Negus-Sons, Inc.)*, 460 B.R. 754, 757 n. 10 (B.A.P. 8th Cir. 2011), *aff'd*, 701 F.3d 534 (8th Cir. 2012) ("*Roswell's* holding appears to be contrary to the plain language of the Uniform Commercial Code"); *Hawkland* §9-510:2 [Rev] at n. 1.50 (finding *Roswell* "troubling"); Fred H. Miller & William H. Henning, *The Danger of Dictum*, 45 UCC Law Letter 1, 3 (Mar. 2011) (the *Roswell*  court "had it exactly backwards").

34

court in that case found that the bank was not authorized to file the termination statement, the bankruptcy court incorrectly concluded that the termination statement released the creditor's security. The Bankruptcy Court found *In re S.J. Cox* unpersuasive because it was inconsistent with sections 9-509 and 9-510 of the UCC. (SPA65.)[8]

Finally, the Committee's reliance on the bankruptcy court decision in *In re Negus-Sons Inc.*, Nos. BK09-82518, A10-8064 (TJM), 2011 WL 2470478 (Bankr. D. Neb. June 20, 2011), *aff'd*, 460 B.R. 754 (B.A.P. 8th Cir. 2011), *aff'd*, 701 F.3d 534 (8th Cir. 2012) is curious given that in that case: (i) the bankruptcy court "held that secured party authorization was required to file a UCC-3" (SPA49); (ii) unlike here, the secured party signed a letter which expressly authorized the agent to file the termination statements at issue; and (iii) on appeal, the Bankruptcy Appellate Panel affirmed the decision and went on to criticize *Roswell* (SPA69, n.196; *see also supra* p. 34, n.7.)

## III. THE BANKRUPTCY COURT CORRECTLY HELD THAT JPMORGAN DID NOT AUTHORIZE THE FILING OF THE UNRELATED UCC-3

As the Committee recognizes, Article 9 of the Delaware Code does not define what constitutes "authority". (Appellant Br. 35.) Accordingly, the

---

[8]     The Committee's reliance on *Ward v. Bank of Granite & Hickory Printing Solutions, LLC (In re Hickory Printing Group., Inc.)*, 479 B.R. 388 (Bankr. W.D.N.C. 2012), is also misplaced because, unlike here, the secured party's employee filed the termination statement. *Id.* at 396.

Bankruptcy Court correctly turned to the law of agency to determine whether

JPMorgan provided such authority:

> to determine whether authorization has been granted, the
> court must consider indicia identified in non-UCC
> agency law – including (importantly here) that to be so
> authorized, the agent must believe (and though the
> distinction does not matter under the facts here,
> *reasonabl*y believe) that the principal intended for the
> agent to terminate the initial financing statement for that
> particular financing.

(SPA7 (emphasis in original).)  *See also* Del. Code Ann. tit. 6, §9-509 cmt. 3

("[l]aw other than this Article . . . generally determines whether a person has the

requisite authority to file a record under this section."); *id.* §1-103 (unless

displaced by specific section of the Delaware UCC, "principles of law and equity,

including the . . . law relative to . . . principal and agent . . . shall supplement [the

UCC]"; *Halpert v. Manhattan Apartments*, 580 F.3d 86, 88 (2d Cir. 2009)

(principles of agency law used to determine whether party gave actual authority).

### A. The Filing Of The Unrelated UCC-3 Was Not Effective Because GM And Mayer Brown Did Not Believe That JPMorgan Authorized Them To File It

"Actual authority exists when an agent has the power 'to do an act or

to conduct a transaction on account of the principal which, with respect to the

principal, he is privileged to do because of the principal's manifestations to him.'"

*Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d 246, 261

(S.D.N.Y. 2002) (citations omitted); *see also* Restatement (Third) of Agency

36

§§2.01, 3.01 (2006).  Actual authority "is created by direct manifestations from the principal to the agent . . . the extent of the agent's actual authority is interpreted in the light of all the circumstances attending these manifestations, including the customs of business, the subject matter, any formal agreement between the parties, and the facts of which both parties are aware." *Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1088 (2d Cir. 1997) (*quoting Demarco v. Edens*, 390 F.2d 836, 844 (2d Cir. 1968)); *see also Realty Growth Investors v. Council of Unit Owners*, 453 A.2d 450, 455 (Del. 1982).

        The Bankruptcy Court correctly emphasized that "[t]he focal point for determining whether an agent acted with actual authority is the agent's reasonable understanding at the time the agent takes action." (SPA35, *quoting* Restatement (Third) of Agency §2.01 cmt. c.)  Indeed:

> An agent does not have actual authority to do an act if the agent does not reasonably believe that the principal has consented to its commission . . . . Lack of actual authority is established by showing either that the agent did not believe, or could not reasonably have believed, that the principal's grant of actual authority encompassed the act in question.

(*Id., quoting* Restatement (Third) of Agency §2.02 cmt. e.)  As the Bankruptcy Court held (SPA35, n.9), courts can and should consider the testimony of the agent concerning the agent's belief to the scope of his authority in determining whether actual authority existed.  *See Playboy Enters., Inc. v. Dumas*, 960 F. Supp. 710,

721 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1347 (2d Cir. 1998); *Merex A.G. v. Fairchild Weston Sys., Inc.*, 810 F. Supp. 1356, 1369-70 (S.D.N.Y. 1993), *aff'd*, 29 F.3d 821 (2d Cir. 1994), *cert. denied*, 513 U.S. 1084 (1995).

Here, of course, GM did not believe it had authority to file a UCC-3 termination statement related to the Term Loan in October 2008 and affirmed that it gave no permission to its attorneys at Mayer Brown to make such a filing. (A3128-29, ¶¶8-9, 11.)  Likewise, the Mayer Brown witnesses examined by the Committee uniformly confirmed that they did not believe that they had any authority to file this document.  (A2642 at 99; A2657 at 47-48; A2676 at 66, 99.) Finding this uncontroverted testimony alone to be "conclusive", the Bankruptcy Court correctly held that JPMorgan did not authorize the filing of the Unrelated UCC-3.  (SPA48-49.)  The Committee completely ignores much of this uncontroverted testimony, as well as the Bankruptcy Court's view of its legal effect.  The Bankruptcy Court's decision should be affirmed for this reason alone.

### B.    The Bankruptcy Court Correctly Held That The Synthetic Lease Termination Agreement Was The Only Grant Of Authority By JPMorgan To Terminate Financing Statements

Consistent with the uncontroverted testimony, the Bankruptcy Court also held that the Synthetic Lease Termination Agreement did not authorize the filing of the Unrelated UCC-3.  (SPA37-38, 44-45; A1045-46, ¶18; A2151; A2641 at 95-96; A2673 at 53-54; A2692 at 56; A2821, ¶10; A3129, ¶11.)  That written

agreement, executed by both GM and JPMorgan on the closing date of the

Synthetic Lease Transaction, unambiguously limited GM's authority to file UCC-3

termination statements only as to "Financing Statements relating to the Properties"

that served as collateral for the Synthetic Lease Transaction.  (SPA12-13; A1045-

46, ¶18; A1335; A1792-94; A2151-62; A2665 at 22-23.)  Thus, the Bankruptcy

Court correctly concluded that:

> When the Unrelated UCC-3 was filed, there was one, and
> only one "direct manifestation[]" of the authority granted
> to GM by JPMorgan here.  That was the Synthetic Lease
> Termination Agreement, the only document embodying a
> grant of authority to GM . . . Having provided the
> necessary grant of authority in one place (in very express
> terms), there was no need to express it again, and the
> Court can find no evidence of an intent to say it again,
> either in the same terms or different ones.

(SPA44-45.)[9]

Further highlighting the weakness of its appeal, the Committee avoids

any mention of the Synthetic Lease Termination Agreement until late in its brief,

---

[9]    Indeed, the Synthetic Lease Termination Agreement is dispositive as to
whether GM and/or Mayer Brown could have reasonably believed that they
were authorized:

> If the principal has stated the agent's authority in a formal
> written instrument, the formality of the statement itself is
> relevant to, and often dispositive of, whether the agent
> could reasonably believe that the principal intended to
> consent to the agent's power to do acts beyond or other
> than those stated in the instrument.

Restatement (Third) of Agency §2.02 cmt. c.

and even then ignores the prominence that the Bankruptcy Court places on this agreement. The Committee's attempts to discredit this agreement are meritless.

First, the Committee argues, for the first time ever, that the Synthetic Lease Termination Agreement is irrelevant because JPMorgan and GM entered into it, and the relevant agency relationship at issue is between JPMorgan and Mayer Brown. (Appellant Br. 43.) But Mayer Brown served as GM's counsel – and was therefore GM's agent – in connection with the repayment of the Synthetic Lease Transaction. (A1042, ¶8; A2619 at 6-7; A2819, ¶2; A3127, ¶4.) Thus, Mayer Brown's authority was limited to the authority provided to GM by JPMorgan. *See* Restatement (Third) of Agency §3.15(2), cmt. b. Indeed, the Committee ignores the fact that the Synthetic Lease Termination Agreement was drafted and circulated by Mayer Brown at GM's request. (A1045, ¶16; A2151-62; A2885-90; A3127, ¶6.) The Committee also ignores GM and Mayer Brown's testimony that the Synthetic Lease Termination Agreement was "[t]he only source" of GM's and Mayer Brown's authority to file UCC-3 termination statements. (A2673 at 53-54; A3129, ¶11.)

Second, the Committee wrongly argues that the Synthetic Lease Termination Agreement is not conclusive because it does not contain a merger clause and thus, the source of GM's authority is not limited to the agreement. (Appellant Br. 43-44.) But the inclusion of a merger clause is irrelevant. The

agreement unambiguously states that GM was authorized only to file termination

statements related to the Synthetic Lease Transaction.  (A2151-62; *see supra* pp.

10-12.)  Under New York law,[10] an agreement that appears complete on its face is

an integrated agreement.  *Morgan Stanley High Yield Secs., Inc. v. Seven Circle*

*Gaming Corp.*, 269 F. Supp. 2d 206, 214 (S.D.N.Y. 2003) (citations omitted).  A

fully integrated agreement, unless ambiguous, will preclude a court from

considering parol evidence to construe the parties' intent.  *Instinet, Inc. v. Ariel*

*(UK) Ltd.*, No. 08-CV-7141 (JFK), 2010 WL 779324, at *4 (S.D.N.Y. Mar. 5,

2010).  That notwithstanding, the Bankruptcy Court did not limit its analysis to the

Synthetic Lease Termination Agreement.  Rather, it examined all of the

circumstances surrounding JPMorgan's manifestations.  (SPA44-48.)  It also

reviewed *all* the evidence from the Committee, and correctly held that none of it

provided a basis to "trump or supplement the one formal agreement between the

parties that expressly addressed the matter of authority."  (SPA46.)

### C. The Bankruptcy Court Correctly Considered JPMorgan's Intentions And Other Factors In Determining That JPMorgan Did Not Authorize The Filing Of The Unrelated UCC-3

Unable to counter the testimony and the Synthetic Lease Termination

Agreement, the Committee instead cherry-picks from, and therefore

mischaracterizes, the Bankruptcy Court's decision.  According to the Committee,

---

[10]  New York law governs the Synthetic Lease Termination Agreement. (A2151.)

41

"the relevant inquiry" is merely whether JPMorgan authorized the physical "act" of

filing the Unrelated UCC-3 – irrespective of whether JPMorgan, GM or Mayer

Brown appreciated or intended the legal consequences of that act. (Appellant Br.

33-34.) The Committee is wrong for multiple reasons.

First, the Committee's argument misconstrues the law. Under the

black letter law of agency, the principal's (JPMorgan) intent and an appreciation

by the agent (GM) of the legal consequences of its acts upon the principal are

clearly relevant in determining whether the agent acted within the scope of actual

authority:

> An agent's understanding of the principal's *interests and
> objectives* is an element of the agent's reasonable
> interpretation of the principal's conduct. *If a literal
> interpretation of a principal's communication to the
> agent would authorize an act inconsistent with the
> principal's interests or objectives known to the agent, it
> is open to question whether the agent's literal
> interpretation is reasonable.*

Restatement § 2.02 cmt. e (emphasis added); *see also id.* illus. 11 (principal's

authorization of an "act" contrary to the interests of the principal known to the

agent does not constitute actual authority).

Comment h of Restatement §2.02 further undermines the Committee's

position:

> [] Consequences of act for principal. Even if a
> principal's instructions or grant of authority to an agent
> leave room for the agent to exercise discretion, the

42

consequences that a particular act will impose on the principal may call into question whether the principal has authorized the agent to do such acts.

Three types of acts should lead a reasonable agent to believe that the principal does not *intend* to authorize the agent to do the act . . .

\* \* \*

Third, some acts that are otherwise legal create *legal consequences* for a principal that are significant and separate from the transaction specifically directed by the principal. *A reasonable agent should consider whether the principal intended to authorize the commission of collateral acts fraught with major legal implications for the principal, such as granting a security interest in the principal's property or executing an instrument confessing judgment* . . .

*Id.* cmt. h (emphasis added).

Nowhere from the actual text, comments or legislative history of the UCC does the Committee support its position that "the relevant inquiry" is only whether the secured party authorized the physical "act" of filing, irrespective of intent. Instead, the Committee only points to the word "file" from UCC sections 9-509 and 9-510 to make the point. (Appellant Br. 33.) The Committee also fails to cite to any agency law that supports its contention. Instead, the Committee merely cites to certain sections in the Restatement (Third) of Agency and highlights that the word "act" appears. (Appellant Br. 35, *citing* Restatement (Third) of Agency §§2.01, 3.01.) Notably those same Restatement sections

43

emphasize that actual authority is limited to the agent's reasonable belief of the principal's authorization. (*Id.*) The Committee's reliance on the Restatement (Third) of Agency section 1.01 Comment d, and *Palmdale Hills Prop., LLC v. Lehman Commercial Paper, Inc. (In re Palmdale Hills Prop., LLC)*, 457 B.R. 29, 50 (B.A.P. 9th Cir. 2011), is also misplaced because this commentary and case deal with the "creation of agency" relationship and not actual authority and the scope thereof. (Appellant Br. 36.) Moreover, the Committee's argument presupposes that the agent in this case believed that JPMorgan authorized the physical "act" of filing the Unrelated UCC-3, which as set forth above, is not the case. (SPA22; A2639-40 at 88-90; A2676 at 66; A2821, ¶10; A3129, ¶11.)

Second, the Committee's argument mischaracterizes the Bankruptcy Court's decision. The Bankruptcy Court concluded that JPMorgan did not authorize the filing of the Unrelated UCC-3 not only because JPMorgan, GM and GM's counsel did not intend the legal consequences of that filing. Rather, relying on this Court's prior decisions, the Bankruptcy Court also considered "all circumstances" attending to the "direct manifestations" from JPMorgan, including the agent's testimony discussed above, the Synthetic Lease Termination Agreement as well as all of the evidence proffered by the Committee, and found that such facts reinforce its conclusion that JPMorgan did not authorize the filing

44

of the Unrelated UCC-3. (SPA44-49, *citing Demarco*, 390 F.2d 836 at 844; *Peltz*, 115 F.3d at 1088.)

For instance, the Bankruptcy Court correctly held that the "subject matter" of nearly every communication and document exchanged between the parties stated that it related to the termination of the Synthetic Lease Transaction, and made "no mention, before the filing of the Unrelated UCC-3, of the Term Loan or of any intent to affect the Term Loan in any way." (SPA45.) In addition, "formal agreements" relating to the Term Loan provided, among other things, that GM covenanted to maintain the security interest in the Term Loan Collateral until the Term Loan was fully paid, and that "the Term Loan Lenders' perfected security interests could not be released without the 'written consent of each Lender.'" (SPA46.) The Committee's appeal ignores all of this evidence and the conclusions of the Bankruptcy Court based on it.[11]

---

[11]     Although not specifically mentioned by the Bankruptcy Court, GM continued to treat the Term Loan Lenders as fully perfected after the Unrelated UCC-3 was filed by negotiating an amendment to the Term Loan in March 2009 and providing to JPMorgan up until the Petition Date certificates certifying the value of the collateral as required by the Term Loan. (*See supra* pp. 22-23.)

### D. The Bankruptcy Court Correctly Held That The Evidence Relied Upon By The Committee Did Not Establish Authority

The Bankruptcy Court also considered evidence proffered by the Committee, and correctly held that none of it established actual authority to file the Unrelated UCC-3.

### 1. Reference On The Draft Synthetic Lease Closing Checklist To A Filing Number Did Not Establish Authority

On appeal, the Committee argues that JPMorgan authorized Mayer Brown to file to the Unrelated UCC-3 because neither it nor its counsel Simpson objected to the early drafts of the Synthetic Lease Closing Checklist that referenced a filing number that pertained to a UCC-1 financing statement filed in connection with the Term Loan. (Appellant Br. 37-38.) The Committee is wrong for multiple reasons. First, as the Bankruptcy Court held, the circulation of the Synthetic Lease Closing Checklist was not an authorization to do anything. (SPA38-40.) By its terms, the checklist did not invite anyone to file the documents listed in it. Thus, it could not be a "direct manifestation" by JPMorgan to GM or its counsel to file the Unrelated UCC-3. *See Demarco*, 390 F.2d at 844.

Second, JPMorgan's failure to object – in effect JPMorgan's "silence" – to the reference of a filing number of "6416808 4" was not a direct manifestation by JPMorgan to file the Unrelated UCC-3. Silence could constitute some manifestation by JPMorgan only if GM and its counsel reasonably drew an

inference from that silence that they had actual authority to file a termination

statement relating to the Term Loan. *See* Restatement (Third) of Agency §1.03

cmt. b, e. Here, neither GM nor Mayer Brown formed any belief that they had

authority to file the Unrelated UCC-3 based on the checklist or otherwise. (*See*

*supra* pp. 19-22.) The Synthetic Lease Closing Checklist, and the cover e-mails

attaching it, did not refer to the Term Loan. (A2859; A2868; A2878: A2885;

A2975; A3020.) Instead, each stated on its face that it related to the repayment of

the Synthetic Lease Transaction. (*Id.*) Although the checklist references the

financing statement with the filing number "6416808 4" and the filing date of

"11/30/06", none of the parties who prepared or received a draft of the Synthetic

Lease Closing Checklist recognized that such filing number and filing date related

to the Term Loan.[12] (A1045, ¶16; A1048-49, ¶16; A2639 at 88; A2642 at 99;

A2657 at 47-48; A2683 at 18; A2684 at 22.) Instead, all parties believed that all of

the documents listed on the checklist, including the financing statement with the

---

[12] Although the "11/30/06" date is close to the November 29, 2006 date of the Term Loan Agreement (SPA16-17), its inclusion on the drafts of the Synthetic Lease Closing Checklist did not lead anyone to recognize its association with the Term Loan. Nor should it have since there were multiple financing statements related to the Synthetic Lease Transaction that were listed on the draft Synthetic Lease Closing Checklists for termination with different file dates of "4/12/02"; 8/25/04; and "5/21/07". (A2865, 2875, 2882, 2905-06, 2972, 2987; A2863, 2872-73, 2879-80, 2922-23, 2943-45, 2968, 2980; A2864, 2874, 2881, 2927, 2969.)

file number 6416808 4, related to the repayment of the Synthetic Lease

Transaction.  (*Id.*)

### 2.  Circulation Of A Draft Of The Unrelated UCC-3 Did Not Establish Authority

The Committee next argues that JPMorgan authorized the filing of the

Unrelated UCC-3 when Simpson "approved" a draft of the Unrelated UCC-3 sent

to it for review.  (Appellant Br. 39.)  This argument also ignores sworn testimony.

The facts are undisputed.  On October 15, 2008, Mr. Green (of Mayer

Brown) circulated to Simpson nearly one hundred pages of draft documents

referenced on the Synthetic Lease Closing Checklist (A2885), including a draft of

the Unrelated UCC-3 among the ten different draft UCC-3 termination statements

referenced on the checklist (A2905-7; A2922-23; A2927-28; A2943-45).  Nothing

in Mr. Green's e-mail or enclosures referenced the Term Loan.  (A2885-2973.)

The Unrelated UCC-3 and other draft UCC-3 termination statements only

referenced their corresponding UCC-1 financing statements by their filing number.

(A2905-07; A2922-23; A2927-28; A2943-45.)  All the parties believed that the

draft closing documents related to the repayment of the Synthetic Lease

Transaction.  (A1045, ¶16; A1048-49, ¶16; A2639 at 88; A2642 at 99; A2657 at

47-48; A2683 at 18; A2684 at 22.)

The Committee trumpets an October 17, 2008 e-mail from Mr.

Merjian of Simpson to Mr. Green of Mayer Brown that states: "Ryan Nice job on

the documents . . ." (Appellant Br. 39; A921-22.) Yet, it ignores Mr. Green's

uncontroverted testimony that he did not understand that specific e-mail response

to approve or authorize the filing of anything:

> I understood [Mr. Merjian's comment] to mean
> that [Mr. Merjian] didn't have additional
> comments to the documents. I didn't understand it
> to mean anything about filing documents because
> we weren't at closing.

(A2640 at 91-92.)

Moreover, aside from the clear understanding of GM and Mayer

Brown, Simpson's purported "approval" could not, as a matter of law, constitute

actual authority to terminate a security interest in connection with the Term Loan.

Simpson was retained by JPMorgan to solely work on the Synthetic Lease

Transaction, not the Term Loan. (A1042, ¶8; A1044, ¶14; A1046, ¶21; A2681 at

9-11; A2692 at 54-55; A2698 at 11; A2700 at 17.) An attorney's authority is

limited by the terms of employment, and, where employed for a specific purpose,

the attorney may not act beyond the scope of authority. *See, e.g.*, *Guidi v. Inter-*

*Cont'l Hotels Corp.*, No. 95 Civ. 9006 (LAP), 2003 WL 1878237, at *3 (S.D.N.Y.

Apr. 14, 2003); *In re Wells*, 129 Misc. 2d 56, 60 (N.Y. Sur. Ct. 1985). Thus, an

attorney does not have the authority to bind the client to what amounts to a

surrender of any substantial right where the act complained of is beyond the scope

of the attorney's representation. *See Bryan v. State-Wide Ins. Co.*, 144 A.D.2d

325, 327 (2d Dep't 1988). Since Simpson was not retained by JPMorgan to perform services with respect to the Term Loan, it was not authorized to bind JPMorgan with respect to the Term Loan. *See Ellicott Machine Co. v. United States*, No. 29907, 1908 WL 736, at *1 (Ct. Cl. Jan. 4, 1909) (even gross negligence on the part of an agent beyond the scope of his authority could not bind his principal); *see also Bank of N.Y. v. Alderazi*, 28 Misc. 3d 376, 380 (N.Y. Sup. Ct. 2010). Nor could Simpson, as JPMorgan's agent, confer to Mayer Brown or GM any authority greater than Simpson itself possessed. *See* Restatement (Third) of Agency §3.15(2) cmt. b.

Finally, the Committee's argument that authority is evidenced by a check mark and *pre-printed language* next to the termination box on the draft Unrelated UCC-3 (Appellant Br. 21-22) is illogical. Such language establishes nothing about whether the secured party authorized the filing of the document – particularly since secured parties are no longer required to sign UCC-3 termination statements. Indeed, taken to its logical conclusion, the Committee's position would render every filed UCC-3 effective regardless of whether it was authorized. Such a position would, in effect, eviscerate sections 9-509 and 9-510 of the UCC.

3.  **The Bankruptcy Court Correctly Held
     That The Synthetic Lease Escrow Letter
     Did Not Convey Authority To Terminate
     <u>A Security Interest In The Term Loan</u>**

The Committee next argues that JPMorgan authorized the filing of the

Unrelated UCC-3 when Simpson "approved" the draft escrow letter that Mayer

Brown provided for review.  (Appellant Br. 41.)  As the Bankruptcy Court

properly held, the plain language of that letter contradicts the Committee's

argument.  (SPA42-44; A3005-3011.)

Again, the Synthetic Lease Escrow Letter by its terms related only to

the Synthetic Lease Transaction and does not reference the Term Loan anywhere.

(A3005-3011.)  No one recognized that a filing number "6416808 4" referenced in

the letter actually pertained to a UCC-1 filed in connection with the Term Loan.

(A1045, ¶16; A1048-49, ¶16; A2639 at 88; A2642 at 99; A2657 at 47-48; A2683

at 18; A2684 at 22.)  Further, the letter, on its face, does not convey any authority

to file the Unrelated UCC-3.  Rather, it merely instructed the escrow agent to

forward UCC-3s, among other documents, to GM's counsel upon closing of the

transaction.  (A3010.)

The Committee asserts that the "obvious purpose" of forwarding the

UCC-3s to Mayer Brown was to allow Mayer Brown to file them, and thus

JPMorgan did not need to articulate any "magic words" authorizing Mayer Brown

to file the Unrelated UCC-3.  (Appellant Br. 42.)  This is incorrect for several

51

reasons.  First, a waiver of creditor's rights cannot be lightly presumed.  *See, e.g.*, *Gilbert Frank Corp. v. Fed. Ins. Co.*, 70 N.Y.2d 966, 968 (1988); *Realty Growth Investors*, 453 A.2d at 456 (Del. 1982).  Intent to waive a right must be "unmistakably manifested" and cannot "be inferred from a doubtful or equivocal act."  *Navillus Tile, Inc. v. Turner Const. Co.*, 2 A.D.3d 209, 211 (1st Dep't 2003).  Accordingly, neither negligence, oversight, thoughtlessness or silence constitute a clear manifestation of intent to relinquish a known right and cannot create a waiver.  *Peck v. Peck*, 232 A.D.2d 540, 540 (2d Dep't 1996); *Golfo v. Kycia Assocs., Inc.*, 45 A.D.3d 531, 533 (2d Dep't 2007), *appeal denied*, 10 N.Y.3d 704 (2008).  Indeed, there must be proof that there was a voluntary and intentional relinquishment of a known and otherwise enforceable right.  *Peck*, 232 A.D.2d at 540; *Golfo*, 45 A.D.3d at 533; *Realty Growth Investors*, 453 A.2d at 456.  Here, as the Bankruptcy Court found, JPMorgan could not possibly have knowingly relinquished its rights in the Term Loan Collateral by virtue of the Synthetic Lease Escrow Letter when no one knew that one of the filing numbers contained in that letter related to the Term Loan.

Second, JPMorgan did, in fact, utter the "magic words" – in the Synthetic Lease Termination Agreement (A2151-62) – restricting GM's and Mayer Brown's authority to file UCC-3s only as to the Synthetic Lease Transaction.  And, GM's counsel, who prepared the Synthetic Lease Escrow Letter, testified that:

> The [termination] statements that related to the
> GM/Chase synthetic lease were permitted to be filed by
> [virtue of] the [Synthetic Lease Termination Agreement],
> not [the Synthetic Lease Escrow Letter].

(A2665 at 21.)

Nor does Simpson's comment that the draft letter "was fine" (Appellant Br. 42), on its face, evidence authority to file termination statements. (SPA42.) Moreover, Mr. Green explicitly testified that he understood the comment only to mean that there were no additional comments to the draft letter. (A2641 at 93-94.) Indeed, Mr. Green did not believe that JPMorgan authorized anything in connection with the draft closing checklist, closing documents and escrow letter that he circulated. (A2639-41 at 88-94; A2642 at 99.)

The single case relied upon by the Committee is inapplicable. *In re Palmdale Hills Prop., LLC* concerned the narrow issue of whether a creditor's agent in a bankruptcy needed express authority to file a proof of claim for the creditor. 457 B.R. at 50. The court held that Rule 3001 of the Federal Rules of Bankruptcy Procedure does not require express authority, and a creditor's authorization to an agent to act on its behalf in a bankruptcy necessarily includes authorization to file a proof of claim because otherwise unsophisticated creditors could be prejudiced, especially ones unfamiliar with bankruptcy procedures. *Id.* Unlike *Palmdale*, JPMorgan did provide express authority to GM and its counsel to file UCC-3s related only to the Synthetic Lease Transaction.

53

The Committee's final argument that JPMorgan never objected to the filing of two other Delaware UCC-3 termination statements listed on the Synthetic Lease Escrow Letter, and therefore created an endorsement of authority to file all UCC-3s, is desperate. (Appellant Br. 42.) Those UCC-3s related to the Synthetic Lease Transaction and JPMorgan expressly authorized the filing of those two documents pursuant to the terms of the Synthetic Lease Termination Agreement. (A1045-46, ¶18; A2151-62; A2673 at 53-54; A2820-21; A3128-29.)

### 4. The Bankruptcy Court Did Not Overlook Testimony From Ryan Green Of Mayer Brown

The Committee also argues that the Bankruptcy Court overlooked testimony from Mr. Green. (Appellant Br. 45-46.) In fact, it is the Committee that ignores his dispositive testimony. Specifically, the Committee argues that after the filing of the Unrelated UCC-3 was discovered in June 2009, Mr. Green told his supervisor Mr. Gordon that "the UCC causing the concern was referenced on the checklist and in the escrow instructions" and was "within the universe of documents involved in the unwind." (Appellant Br. 46-47.) Relying solely on this testimony, the Committee blithely concludes that it:

> [C]onfirms that the closing checklist and escrow letter
> approved by JPMorgan and its counsel were
> manifestations that [Mr. Green] and Mayer Brown
> subjectively understood at the time to authorize the filing
> of the [Unrelated UCC-3].

(Appellant Br. 47.) That is utterly untrue.

First, the testimony of Mr. Green cited by the Committee does not, on its face, support the Committee's conclusion. It is simply a statement of the obvious – that the Unrelated UCC-3 was referenced by filing number on drafts of closing documents. Thus, the Committee does not come close to carrying its burden on appeal that the Bankruptcy Court committed "clear error" in allegedly overlooking this testimony from Mr. Green. *See In re Duplan Corp.*, 212 F.3d at 151. Second, the Committee's conclusion is contradicted by Mr. Green's uncontroverted and perfectly clear testimony, cited by the Bankruptcy Court and disregarded by the Committee, that he did not believe that Mayer Brown was authorized to file the Unrelated UCC-3, or that JPMorgan authorized anything in connection with the draft closing checklist, closing documents and escrow letter that he circulated. (SPA22; A2638-40 at 83-84, 88-89; A2642 at 99.)

### 5. The Bankruptcy Court Did Not Misconstrue The Affidavit Of Robert Gordon

Next, the Committee nitpicks that Mr. Gordon's final affidavit was inconsistent with an earlier draft. (Appellant Br. 48.) Specifically, the Committee argues that a draft of Mr. Gordon's affidavit stated that "Mayer Brown was not authorized to terminate any financing statement related to the Term Loan Agreement" but that Mr. Gordon revised this language to "GM was not authorized by the Termination Agreement to terminate any financing statement related to the Term Loan Agreement." (*Id.*) Based on this edit, the Committee wildly assumes

55

that "the professionals at Mayer Brown thought they were authorized to file the [Unrelated UCC-3]." (*Id.*) Again, Mr. Gordon's edit to the affidavit, on its face, does not support the Committee's conclusion. To the contrary, it supports JPMorgan's position that the Synthetic Lease Termination Agreement evidences the actual, limited authority provided to GM as JPMorgan's agent. Again, therefore, the Committee does not come close to carrying its burden based on this evidence that the Bankruptcy Court committed clear error.

Moreover, after he signed his affidavit, Mr. Gordon – along with every other witness for Mayer Brown and GM – uniformly testified that Mayer Brown did not believe they were authorized to file the Unrelated UCC-3 by the Synthetic Lease Termination Agreement or any other act of JPMorgan and its counsel. (*See supra* pp. 19-22.) Accordingly, nothing about Mr. Gordon's edit to his affidavit supports the Committee's position.

### 6. The Affidavit From GM's Debra Hoge Is Relevant

The Committee finally attempts to dismiss the affidavit of GM's Ms. Hoge as irrelevant. (Appellant Br. 48-49.) First, the Committee argues that the affidavit has no sufficient foundation. (*Id*. at 48.) This argument is rebutted by the affidavit itself, which clearly states that Ms. Hodge was GM's Director of Worldwide Real Estate at all relevant times and that one of her responsibilities included the Synthetic Lease Transaction. (A3126-27, ¶2.) Indeed, Ms. Hoge

actually executed the Synthetic Lease Termination Agreement for GM. (*Id.*, ¶7; A2153.)

Second, the Committee again argues that the relevant agency relationship at issue is the one between JPMorgan and Mayer Brown, and not GM. Yet, as Ms. Hoge's affidavit confirms, Mayer Brown was GM's counsel in connection with the Synthetic Lease Transaction (A3127, ¶4), and as such, acted on GM's behalf and under the authority provided to GM by JPMorgan, when it filed UCC-3 termination statements in October 2008. Accordingly, Ms. Hoge's affidavit is clearly relevant. To that end, it states that GM was not authorized, nor did it believe that it was authorized, to file the Unrelated UCC-3, and that did not provide its counsel, Mayer Brown with authority to file that document. (A3128, ¶11.)[13]

## IV.   THE UCC IS A "NOTICE FILING" SYSTEM

In a last ditch effort, the Committee argues that "the Bankruptcy Court's decision threatens to entangle the UCC's public notice system, which depends on the reliability of public filings, in bottomless inquiries into the

---

[13]   The Committee also argues that the Bankruptcy Court's holding is "tantamount" to a ruling that the Unrelated UCC-3 was legally ineffective because of the mutual mistake of JPMorgan, GM and their respective counsel. (Appellant Br. 58.) This is yet another red herring. Neither the Bankruptcy Court, nor JPMorgan, has ever claimed that the filing of the Unrelated UCC-3 is ineffective because of "mutual mistake". The Unrelated UCC-3 is ineffective because it was unauthorized under Article 9 of the UCC and relevant agency principles.

intentions that lie behind those filings . . . and thereby introduce uncertainty and disruption to the secured lending markets." (Appellant Br. 6, 61.) The Committee's "Hail Mary Pass" is flawed.

As the Bankruptcy Court correctly held, the UCC has indeed adopted a "notice filing" system – one that requires further inquiry by concerned parties to ascertain the complete state of affairs. (SPA69-71.) *See also* Del. Code Ann. tit. 6, § 9-502 cmt. 2; *SEC v. Credit Bancorp, Ltd.*, 386 F.3d 438, 454 (2d Cir. 2004); *Md. Nat'l Bank v. Porter-Way Mfg. Co.*, 300 A.2d 8, 10 (Del. 1972) ("The Delaware Uniform Commercial Code's financing statement is designed to give public notice of the existence of a security agreement and to give enough information as to permit interested persons to make inquiries to the parties of the secured transaction to ascertain details regarding the debtor's encumbered assets."). The official commentary to the UCC[14] explicitly states that the documents on record, such as a UCC-3, may be insufficient to ascertain "the complete state of affairs" but Article 9 of the UCC only requires information sufficient to facilitate further inquiry. (*Id.* at

---

[14] Although Comment 2 to UCC section 9-502 addresses the sufficiency of a financing statement, it is also applicable to UCC-3 termination statements. (SPA71.) A termination statement is a record "relating to the initial financing statement" and as such, it is part of a "financing statement" as this term is defined by the UCC. *See* Del. Cod Ann. tit. 6, §9-102(39).

70.)   Accordingly, subsequent lenders must perform their own due diligence in order to determine whether a filed UCC-3 termination statement was authorized.[15]   (*Id.*)

The Committee fails to address the UCC official commentary or any of the secondary authority on point, and instead relies on a handful of inapplicable cases.  In particular, as the Bankruptcy Court concluded, the Committee's reliance on *Roswell* is misplaced because it erroneously concluded that the official commentary to the UCC concerning the "notice filing" regime only applied to UCC-1s, not UCC-3s as well.[16]  (SPA71.)

---

[15]   *See, e.g.*, Sigman, *supra* p. 29; National Conference of Commissioners on Uniform State Laws, *Draft Amendments to Uniform Commercial Code Article 9*, §9-518 cmt. 2 (July 2010) (". . . searchers bear the burden of determining whether the filing of every subsequent record [referring to a termination statement] was authorized.") ; Miller & Henning, *supra* p. 34, n.7 (". . . the burden that the true state of affairs might be other than as indicated in the filing-office records falls on the searcher, which can inquire further and thereby determine the true state of affairs.").

[16]   The other cases relied on by the Committee are inapplicable because none are factually on point or address Official Comment 2 to the UCC § 9-502. *See generally Clean Burn Fuels, LLC v. Purdue BioEnergy, LLC (In re Clean Burn Fuels, LLC)*, 492 B.R. 445 (Bankr. M.D.N.C. 2013) (does not discuss filing of a termination statement); *In re Silvernail Mirror & Glass, Inc.*, 142 B.R. 987 (Bankr. M.D. Fla. 1992) (secured party signed and filed UCC-3);  *ACF 2006 Corp. v. Merritt*, No. CIV-12-161, 2013 WL 466603 (W.D. Okla. Feb. 7, 2013) (involving argument by secured lender that equity should supplant the UCC's provisions governing priority of security interests).

## V. JPMORGAN AND THE TERM LOAN LENDERS WERE SECURED CREDITORS AS OF THE PETITION DATE PURSUANT TO OTHER UCC-1 FINANCING STATEMENTS

It is also undisputed that JPMorgan and the Term Loan lenders also were secured as of the Petition Date by: (i) twenty-six fixture filings filed by JPMorgan in counties where Term Loan Collateral was located; and (ii) a UCC-1 financing statement filed with the Delaware Secretary of State against Saturn as debtor. (A1985-2146.) The Committee has not and does not challenge JPMorgan's and the Term Loan Lenders' perfection of their security interests in the collateral related to these filings. Pursuant to the Bankruptcy Court's DIP Order, JPMorgan and the other Term Loan Lenders have been released from any and all claims and causes of action, including avoidance actions, related to the Term Loan except those relating to the perfection of their security interests in the Term Loan Collateral. (A998, §19(d).) Accordingly, summary judgment in favor of JPMorgan was independently warranted because perfection is not at issue relating to these filings and the Committee is precluded from raising any other issues relating to these filings by the DIP Order, including the value of the fixture filings and Saturn's assets.

## **CONCLUSION**

The Bankruptcy Court's judgment should be affirmed.

Dated:     New York, New York
           December 9, 2013

                                        Respectfully submitted,

                                        KELLEY DRYE & WARREN LLP


                                        By:      /s/ John M. Callagy
                                                John M. Callagy
                                                Nicholas J. Panarella
                                                Martin A. Krolewski
                                        101 Park Avenue
                                        New York, New York 10178
                                        (212) 808-7800

                                        Attorneys for Defendant-Appellee
                                        JPMorgan Chase Bank, N.A.

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,810 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32 (a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

Dated:     New York, New York
           December 9, 2013

               Respectfully submitted,

               KELLEY DRYE & WARREN LLP

               By:   <u>/s/ John M. Callagy</u>
                    John M. Callagy
                    Nicholas J. Panarella
                    Martin A. Krolewski
               101 Park Avenue
               New York, New York 10178
               (212) 808-7800

               Attorneys for Defendant-Appellee
               JPMorgan Chase Bank, N.A